WALTER  C.  JOSEPH,  ADMINISTRATOR,  APPELLANT,  V. CUDAHY PACKING COMPANY, APPELLEE.

FILED FEBRUARY 27, 1914.  No. 17,393.

1. **Trial:** DIRECTING VERDICT. The trial court should direct a verdict in favor of defendant, where the evidence is insufficient to sustain a judgment for plaintiff.

2. **Master and Servant:** DEATH OF SERVANT: ASSUMPTION OF RISK. In actions not governed by the employers' liability act (laws 1913, ch. 198), "an employee assumes the risks arising from the unsafe condition of premises where his labor, or a portion of it, is to be performed, when the risks and conditions are known to him, or are apparent and obvious to persons of his experience and understanding, if he voluntarily enters into the employment, or, after commencing, makes no complaint or objection in respect to the hazards." *Chicago, B. & Q. R. Co. v. McGinnis,* 49 Neb. 649.

APPEAL from the district court for Douglas county: ABRAHAM L. SUTTON, JUDGE. *Affirmed.*

*Nelson C. Pratt,* for appellant.

*Greene, Breckenridge, Gurley & Woodrough, contra.*

ROSE, J.

This is an action to recover $15,000 in damages for alleged negligence resulting in the death of John Czuba, who had been an employee of defendant. While engaged in wheeling into a tank-room truck-loads of materials used in manufacturing glue, he fell into a vat and was scalded with hot fluid. Defendant denied the negligence imputed to it. The issues were tried to a jury. The district court gave a peremptory instruction in favor of defendant, and from a judgment of dismissal plaintiff appeals.

The tank-room was 40 feet wide and 90 feet long, extending north and south, with a row of 10 open vats below the surface on each side. From the southeast corner they were numbered consecutively up the east side and down the west from 1 to 20. Between the rows there was a platform 16 feet wide. The entrance and the exit were at the southwest corner by vat 20. In the tank-room there were five lights along each side and three in the middle. One of those along the west side was between vats 19 and 20, and another near the platform at the entrance and the exit. Czuba came into the tank-room with a truck-load of materials, went north, and emptied the contents of his truck into vat 13. He then turned to go back the way he had entered. On his way out he mistook the light between vats 19 and 20 for the one at the exit, and fell into vat 19.

Was the peremptory instruction erroneous? It is alleged in the petition that defendant was negligent in failing to protect employees from the vats by railings. There is no proof to sustain this charge. It is not shown that defendant did not conform to the usual and ordinary

methods and customs in respect to railings, nor that railings were reasonably necessary for the protection of employees in the exercise of ordinary care for their own safety under the circumstances. On the contrary, the evidence shows without contradiction that railings sufficient to prevent employees from falling into hot liquids would interfere with the work of dumping ingredients into the vats as needed in manufacturing glue. A platform 16 by 90 feet had been provided for workmen. The seething vats along the sides gave their own signals of danger. On this issue the evidence would not support a judgment against defendant.

Plaintiff also charges that defendant was negligent in allowing too much steam from the vats to accumulate in the tank-room. During the forenoon on the day of the accident a fan, which had been used to blow steam out of the tank-room, was for some unexplained reason not in operation. A witness, who was on the platform at the time, testified the steam was so dense that it obscured lights at a distance of six feet. The explanation of Czuba, after he had been taken out of the vat, was proved by plaintiff. When asked, "What was the matter?" and, "Couldn't you see the way?" Czuba replied: "It was my mistake. I made a mistake of the lights." The import of this evidence, in connection with other undisputed testimony, is that Czuba went southward until he approached the light between vats 19 and 20, and, mistaking it for the light at the exit, turned toward the west, the direction of the passageway out, and fell into vat 19.

One of the answers of defendant to the charges of negligence is that Czuba assumed the risks of his employment. Is recovery defeated on this ground? There is no proof that the fan, when in operation, cleared the tank-room of steam. The only difference between the conditions of the steam when the fan was in motion and when it was not was in the degree of density. Czuba's regular duties kept him in the hog-killing department, but, when work there was slack, he was transferred to the tank-room. He had been working in the latter place a week or

two at a time for a year and a half. He had been at work there the last time three days or more. The accident occurred at 11:30 in the forenoon, and he had come on duty at 7 o'clock in the morning. Between those hours he came into and went out of the tank-room at intervals of about 15 minutes. There is nothing to show that the conditions as to steam in the morning had changed before 11:30. The foreman testified that he had a conversation with Czuba before the accident. The account of the former as to what he said is: "I just said to him, 'Kind of watch out. It is kind of steamy.' I says, 'Look around a bit.'" He also said that Czuba answered: "I know this about as good as you." The conditions were not only obvious to Czuba, but were in fact known to him. With nothing to show a change in the hazards of his employment, he had been in and out of the tank-room at short intervals for nearly half a day. He voluntarily continued to perform his duties with knowledge of their risks. He made no complaint in respect to them. There was no attempt by plaintiff to show that defendant had promised to improve existing conditions. On the undisputed evidence the case falls within the following rule of law: "An employee assumes the risks arising from the unsafe condition of premises where his labor, or a portion of it, is to be performed, when the risks and conditions are known to him, or are apparent and obvious to persons of his experience and understanding, if he voluntarily enters into the employment, or, after commencing, makes no complaint or objection in respect to the hazards." *Chicago B. & Q. R. Co. v. McGinnis*, 49 Neb. 649.

The accident cannot be contemplated without emotion; but the record contains no evidence of actionable negligence on the part of defendant, and consequently the peremptory instruction must be approved.

AFFIRMED.

REESE, C. J., dissenting.

It cannot be inferred that it was the "custom" of defendant to allow the tank-room to become so filled with

steam as to render the lights invisible at a greater dis-
tance than six feet. If the lights were rendered invisible
at that distance, it must be apparent to any thinking
person that the tank-room was shrouded in almost total
darkness. A large fan had been placed in an opening in
the far end wall for the purpose of carrying the steam out
of that room, evidently in order that the employees could
see their way and protect themselves from the great dan-
ger of terrible accidents. So far as appears, that fan
had been kept continually in motion, accomplishing the
purpose of its use, until the day of the accident, when,
"for some unexplained reason," it was not in operation.
Perhaps of all days on that day that fan should have been
kept in operation, so that employees could see and avoid
the lurking danger. Whose duty was it to keep that fan
in operation? Surely not the employees. Negligence was
a question of fact for the submission to the jury. If so,
was not the failure to perform that duty evidence of
negligence on the part of the employer? Should not the
question have been submitted to the jury? It seems to
me that there can be but one answer to the question, and
that answer in the affirmative.

Did the decedent assume the risk by continuing to work
on that day? Had he not the right to expect that the fan
would be put in motion when the extraordinary accumula-
tion of steam became apparent? If "custom" is to govern,
he certainly had, for it is clearly shown that it was the
custom of defendant to keep the fan running. It is con-
tended that decedent knew of the condition and consequent
danger in time to have avoided the accident; that he was
informed of the danger by the foreman. What was that
information? The foreman said to him: "Kind of watch
out. It is kind of steamy. Look around a bit." The an-
swer of decedent was: "I know this about as good as you."
Knew what? That it was "kind of steamy." I apprehend
that he knew it was "kind of steamy," for such was, no
doubt, the case all the time, but that was no proof that
he knew there was so near a condition of total darkness

95 Neb. 26

before he entered. He knew it was a bit steamy in there, and that he should look around a bit. That meant to him that, if he would look around a bit, he could see his way in and out and avoid all danger. It could have meant nothing else.

Before his death he said he had made a mistake; that he had "made a mistake of the lights." Of course he made a mistake. Could any one think he would deliberately walk, or jump, into the seething caldron? He mistook the dim light over the tank for the one near the door. This was his mistake. He could see nothing but the light, else he would not have fallen into the tank and lost his life.

I think the case should have been submitted to the jury, and that the district court erred in withdrawing it from them.

HAMER, J., dissenting.

The plaintiff's decedent fell in the vat of boiling glue and was cooked to death because he was unable to find his way out of the tank-room filled with steam. He could not see. It was the duty of the defendant to furnish a reasonably safe place in which to conduct his business of glue making, and, when the fan failed to remove the steam from the room so that the occupants could not see where to go, the place was then not "reasonably safe," and it was the duty of the defendant company to shut down until the necessary repairs were made and the room was in a normal condition. The failure of the fan to remove the steam produced a temporary condition that found these men working there, and not likely to insist on being at once discharged. They naturally would want to go along with the work while it continued, and, as the interference was supposed to be only temporary, they were not likely to make objection on that account. It cannot, I think, for that reason be said that a fair foundation was laid for an *assumption of risk.* The workers could not have contemplated it. That the injured man may have said something when spoken to about being careful that indicated

that he was impatient was but a natural expression of one not use'd to receiving instructions. In any event the question of negligence was clearly in the case, and it should have been submitted to the jury for their verdict. A verdict for the plaintiff under the testimony would not have been "so wholly unsupported by the evidence that we can say, as a matter of law, that it is clearly wrong," following *Armstrong v. Union Stock Yards Co.*, 93 Neb. 258. Therefore, if rendered, the verdict would have to stand.

The question of negligence is clearly one to submit to the jury. *Neice v. Farmers Co-Operative Creamery & Supply Co.*, 90 Neb. 470. In that case it was said in the body of the opinion: "The matter is peculiarly within the province of the jury, and, when the evidence is conflicting, this court cannot interfere with the verdict of the jury, unless upon the whole evidence the verdict is clearly wrong."

As to the assumption of risk, it is held in *Elliott v. General Construction Co.*, 93 Neb. 453, that "An employee does not ordinarily assume risks arising from conditions beyond his knowledge and not obvious to a person of his experience an'd understanding." That seems to hit this case squarely.